In the

# United States Court of Appeals

## For the Seventh Circuit

————————————

No. 21-2287

ROY SARGEANT,

*Plaintiff-Appellant,*

*v.*

ARACELIE BARFIELD,

*Defendant-Appellee.*

————————————

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 19 C 50187 — **Iain D. Johnston**, *Judge.*

————————————

ARGUED MARCH 27, 2023 — DECIDED NOVEMBER 28, 2023

————————————

Before HAMILTON, SCUDDER and PRYOR, *Circuit Judges*.

PRYOR, *Circuit Judge.* The question before us is whether a federal prisoner can bring a *Bivens* action alleging that a prison official failed to protect him from violent attacks by his cellmates. After the Supreme Court's recent decisions in this area, the answer is no.

# I. Background

## A. Factual History

We recount the facts as alleged in the complaint. *See Schillinger v. Kiley*, 954 F.3d 990, 994 (7th Cir. 2020). Roy Sargeant is a federal prisoner, and this case arises from retaliatory acts taken against him by Aracelie Barfield, who was Sargeant's case manager, responsible for evaluating his progress in prison.

The dispute between Sargeant and Barfield began with grievances. Sargeant filed a grievance against another prison official, Nicole Cruze, after she commented on his sexual preferences and refused to give him some books that he had ordered. When Barfield showed Sargeant the prison's response to one of those grievances, he noticed that it was signed by Cruze and pointed out that, under the prison's rules, Cruze should not have seen a grievance lodged against her. Apparently unhappy with Sargeant's remarks, Barfield "angrily" told others about the grievance. This led Sargeant to file a separate grievance against Barfield.

In retaliation, Barfield "repeatedly" put Sargeant in cells with prisoners that she knew were violent. As a "programming" prisoner with a "non-active protected custody" status, Sargeant alleged that Barfield violated policy by housing him with "active" prisoners on several occasions. At oral argument, Sargeant's attorney explained that programming status means a prisoner has cooperated with the government, while active status means that a prisoner has not cooperated. Predictably, this led to "some fights" between Sargeant and his cellmates, before he was transferred to another prison.

### B. Procedural History

Proceeding without an attorney, Sargeant sued Barfield seeking monetary damages. He alleged that Barfield retaliated against him for filing grievances. He did not, however, identify in his complaint which of his constitutional rights she had allegedly violated.

Because Sargeant is a prisoner, the district judge initially assigned to his case, Judge Durkin, had to screen his complaint pursuant to 28 U.S.C. § 1915A. In doing so, Judge Durkin decided that Sargeant could proceed only on a First Amendment retaliation claim and dismissed "any other intended claims." Judge Durkin did not discuss whether the allegations in the complaint stated an Eighth Amendment cause of action.

Barfield moved to dismiss the complaint on grounds that, under the *Bivens* doctrine, a federal prisoner cannot recover damages for a violation of First Amendment rights. Because of the complexity of that issue, Magistrate Judge Jensen appointed counsel for Sargeant. The case was then transferred from Judge Durkin to Judge Johnston who, after briefing, agreed with Barfield and dismissed the complaint with prejudice.

## II. DISCUSSION

On appeal, Sargeant abandons his First Amendment theory in favor of another argument. He contends that, when screening his complaint, the district court missed a cause of action—an Eighth Amendment claim alleging that Barfield failed to protect him from other prisoners. This claim, Sargeant argues, should have been allowed to proceed under the *Bivens* doctrine.

We take a fresh look at a screening dismissal, accepting the allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor. *Schillinger*, 954 F.3d at 994.

## A. Waiver

We first address whether Sargeant preserved this argument. Barfield does not think so. As she sees it, because Sargeant never amended the complaint or contested the screening dismissal, he is raising the Eighth Amendment claim for the first time on appeal.

We disagree. The Federal Rules of Civil Procedure do not require a plaintiff to allege legal theories or even facts corresponding to each element of a claim. *Zall v. Standard Ins. Co.*, 58 F.4th 284, 295 (7th Cir. 2023); *Zimmerman v. Bornick*, 25 F.4th 491, 493 (7th Cir. 2022). This is especially true for litigants proceeding without an attorney. *See Ortiz v. Downey*, 561 F.3d 664, 670 (7th Cir. 2009) (concluding that a plaintiff's failure to mention a legal theory was "not an obstacle to his claim, particularly in light of his status as a pro se litigant"); *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) (explaining that we construe pro se complaints liberally).

What matters is whether the raw materials of Sargeant's complaint—the facts—plausibly suggested that Barfield violated his Eighth Amendment rights. *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014). Looking to the facts in Sargeant's complaint, we see that they did so. A prison official is liable under the Eighth Amendment for failing to protect a prisoner if she knows of and disregards an excessive risk to the prisoner's health or safety. *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023). Sargeant alleged in the complaint that, after Barfield

placed him with cellmates she knew were violent and had more stringent classifications, the cellmates attacked him. These are the sorts of facts that commonly underpin Eighth Amendment failure-to-protect claims. *See e.g.*, *LaBrec v. Walker*, 948 F.3d 836, 839–41 (7th Cir. 2020); *Gevas v. McLaughlin*, 798 F.3d 475, 478–81 (7th Cir. 2015).

When the district court screened out the Eighth Amendment claim—by dismissing "any other intended claims" aside from the First Amendment claim—Sargeant was free to save his rebuttal for appeal. A screening dismissal dispensing with only part of a complaint is an interlocutory order. *See Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1018–20 (7th Cir. 2013) (concluding the same with respect to a complaint screened under 28 U.S.C. § 1915(e)(2)—the statute allowing courts to screen the complaints of litigants who cannot pay the filing fee). And interlocutory orders may be "stored up" by a litigant and raised on appeal as part of a challenge to the final judgment. *Kurowski v. Krajewski*, 848 F.2d 767, 772 (7th Cir. 1988). In other words, a litigant need not contest an interlocutory ruling as it comes down to preserve an appellate challenge to it. *Walker v. Abbott Labs.*, 340 F.3d 471, 475 (7th Cir. 2003); *see Cesal v. Moats*, 851 F.3d 714, 720–21 (7th Cir. 2017) (considering a challenge to a screening dismissal even though other claims had been resolved at the summary judgment stage).

The district court appointed Sargeant's attorney to respond to Barfield's motion to dismiss.[1] In her response, Sargeant's attorney naturally focused on the claim she was

---

[1] The First Amendment claim was the only one remaining after screening and thus the only one at issue in the motion to dismiss.

appointed to brief. True, she could have amended the complaint or asked the court to reconsider its screening order, but no authority required her to do either to preserve Sargeant's Eighth Amendment argument for appeal.

## B. Merits

We turn now to the merits. On appeal, Sargeant argues that he is able to bring an Eighth Amendment failure-to-protect claim against Barfield under the *Bivens* doctrine. The government responds that a failure-to-protect claim is not one of the limited suits allowed under *Bivens*.

### 1. Bivens Background

The Constitution does not explain when a plaintiff can seek damages from a federal officer who has violated its provisions. That's where the *Bivens* doctrine comes in. Its story plays out in three acts: "creation, expansion, and restriction." *Silva v. United States*, 45 F.4th 1134, 1138 (10th Cir. 2022).

For simplicity, we begin the story with *Bivens* itself, although we recognize that the roots of the doctrine stretch far earlier. In *Bivens*, the Supreme Court concluded that the "very essence" of civil liberties implied a right to sue a person who violates those liberties. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971) (quoting *Marbury v. Madison*, 1 Cranch 137, 163 (1803)). From that premise, the Court reasoned that an individual could seek damages from Federal Bureau of Narcotics agents who unreasonably searched and seized him in violation of the Fourth Amendment. *Id.*

Over the next ten or so years, the Supreme Court recognized an implied constitutional right to damages two more times. In *Davis v. Passman*, the Court extended *Bivens* to a

claim that a Congressman discriminated against a staffer because of her sex in violation of the Fifth Amendment. 442 U.S. 228 (1979). Then in *Carlson v. Green*—a case lying at the heart of this appeal—the Court recognized a *Bivens* remedy for a claim alleging that prison officials violated the Eighth Amendment by giving inadequate medical care to an asthmatic prisoner. 446 U.S. 14 (1980).

Soon after, the Supreme Court changed course and started to chisel away at the *Bivens* doctrine. The modern Court views *Bivens*, *Davis*, and *Carlson* as mistakes of an "ancien[t] regime" and cautions against implying new causes of action because creating remedies is a job for the legislature, not the judiciary. *Ziglar v. Abbasi*, 582 U.S. 120, 131–32, 135 (2017) (emphasis omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)).

As a result, since those original three *Bivens* cases, the Supreme Court has consistently declined to imply new damages remedies. *See id.* at 135 (collecting cases). We can see the modern contours of *Bivens* most clearly in three recent cases, starting with *Ziglar v. Abbasi*. That case explained that a two-step framework applies when determining whether a plaintiff may bring a claim under *Bivens*. First, a court must ask whether the claim presents a "new *Bivens* context." *Id.* at 139. A context is new if the claim is "different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Id.* The Court offered some reasons why a claim might differ in a meaningful way from an earlier *Bivens* case:

> [T]he rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the

> statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 139–40.

If the context is new, a court moves to the second question and ask whether "special factors counsel[] hesitation" against implying a remedy. *Id.* at 136, 140. This inquiry "concentrate[s] on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 136. If so, a court may imply a *Bivens* remedy. *Id.* at 139–40.

Next came *Hernandez v. Mesa*, 140 S. Ct. 735 (2020). In this case, the Supreme Court clarified that the same constitutional amendment does not necessarily mean the same context, explaining that "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Id.* at 743.

Last, and most significant to this appeal, is *Egbert v. Boule*, 596 U.S. 482 (2022). In this case, the Supreme Court modified the *Abbasi* approach in a couple of ways.

Initially, the Court cast doubt on whether the *Abbasi* framework for analyzing *Bivens* claims always contains two steps. The Court explained that "[w]hile our cases describe two steps, those steps often resolve to a single question: whether there is any reason to think that Congress might be

better equipped to create a damages remedy." *Id.* at 492. This is because the final two step-one considerations—the risk of disrupting other branches and the presence of special factors that prior cases did not consider—are similar to the second step. *Id.*; *Hernandez*, 140 S. Ct. at 756 n.3 (Ginsburg, J., dissenting) (acknowledging that these considerations overlap with step two).

*Egbert* next explained that, before authorizing damages, a court must ask "whether there is any rational reason (even one) to think that Congress is better suited to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert*, 596 U.S. at 496 (quoting *Abbasi*, 582 U.S. at 136). If the answer is yes, or "arguably" yes, a court cannot provide a *Bivens* cause of action. *Id.* at 492. For example, if "Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy." *Id.* at 498.

### 2. Identifying the Context of Sargeant's Claim

Under the modern *Bivens* framework, the initial question is whether Sargeant's Eighth Amendment claim against Barfield for failure to protect arises in an existing *Bivens* context.

Sargeant contends that the Supreme Court has already approved of a *Bivens* action in the failure-to-protect context—not in one of the three original cases, but in *Farmer v. Brennan*, 511 U.S. 825 (1994). A circuit split exists on this point, with the Third and Fourth Circuits disagreeing over whether *Farmer* created a new context. *Compare Bistrian v. Levi*, 912 F.3d 79, 90–91 (3d Cir. 2018), *with Bulger v. Hurwitz*, 62 F.4th 127, 139 (4th Cir. 2023).

In *Farmer*, federal officials moved a transgender prisoner to a facility with a history of assaults despite allegedly knowing that she would be susceptible to violence. 511 U.S. at 830–31. After the prisoner was attacked by her cellmate, she sought money damages under *Bivens*, alleging that the officials failed to protect her in violation of the Eighth Amendment. *Id.* Presupposing that the prisoner could seek damages, the Supreme Court clarified the now-familiar "deliberate indifference" standard for Eighth Amendment claims, vacated the grant of summary judgment in favor of the federal officials, and remanded for further proceedings. *Id.* at 835–40, 851.

In all this, the opinion mentioned *Bivens* twice. The first time to acknowledge—in the procedural history section—that the plaintiff "filed a *Bivens* complaint." *Id.* at 830. The second time as an aside: to explain that although "*Bivens* actions against federal prison officials (and their 42 U.S.C. § 1983 counterparts against state officials) are civil in character," it still makes sense to base the deliberate-indifference standard on criminal law's standard of subjective recklessness. *Id.* at 839–40. The Court never held—just assumed—that a *Bivens* remedy was available to the plaintiff.

In interpreting *Farmer*, Sargeant invokes the Third Circuit's reasoning. He believes that *Farmer* impliedly established a new context—or at least stretched the bounds of *Carlson's* context. *See Bistrian*, 912 F.3d at 90–91 (concluding the same before *Egbert*). The Fourth Circuit, with the benefit of *Egbert's* guidance, disagreed with that reasoning and questioned whether the Supreme Court would establish a new *Bivens* context in such a secretive way. *Bulger*, 62 F.4th at 139.

We now join the Fourth Circuit. A silent assumption in an opinion cannot generate binding precedent.[2] *United States v. Rodriguez-Rodriguez*, 453 F.3d 458, 460 (7th Cir. 2006) ("[A]ssumptions are not holdings."). That's especially true in the realm of *Bivens*, where the Supreme Court has repeatedly cautioned against implying new remedies. Indeed, in *Egbert* itself, the Court held that the plaintiff's First Amendment claims could not be brought under *Bivens* even though an earlier Supreme Court opinion had assumed, but not decided, otherwise. 596 U.S. at 498–99 (citing *Hartman v. Moore*, 547 U.S. 250, 252 (2006) (assuming that the case presented a valid "*Bivens* action against criminal investigators for inducing prosecution in retaliation for speech")). Any other approach would invite chaos because litigants could uncover and rely on unspoken assumptions in every opinion.

The Supreme Court's three most recent opinions in the *Bivens* space align with our conclusion. Each recognized only three times that a constitutional damages remedy has been implied against federal officers: in *Bivens*, in *Davis*, and in *Carlson*. *Egbert*, 596 U.S. at 490–91; *Hernandez*, 140 S. Ct. at 741; *Abbasi*, 582 U.S. at 131. Not once has the Supreme Court mentioned *Farmer* alongside those cases, and we think it would have if *Farmer* created a new context or clarified the scope of an existing one.

The dissent maintains that we are anticipating the Supreme Court's next move. Given that the Court has not overruled *Farmer*, the dissent argues, we should recognize *Farmer* as an existing *Bivens* context. We respectfully believe,

---

[2] We note as well that, in *Farmer*, the parties neither briefed nor discussed at oral argument whether the case was properly a *Bivens* case.

however, that this line of reasoning misses an important detail. To be sure, we fully agree that the Supreme Court "does not overrule itself silently." *Censke v. United States*, 947 F.3d 488, 492 (7th Cir. 2020). But, as discussed above, the Supreme Court also does not make holdings silently. *Rodriguez-Rodriguez*, 453 F.3d at 460. Because *Farmer* never said anything about the scope of the *Bivens* doctrine, there is no *Bivens* holding in *Farmer* for today's Supreme Court to overrule.

Against this backdrop, we decline to rule that another *Bivens* context lurks in the shadows.

### 3. Evaluating Sargeant's Claim Against Carlson

This means we must put Sargeant's claim up against one of the three recognized *Bivens* precedents to see if it arises in a new context. Naturally, Sargeant selects *Carlson*—also an Eighth Amendment case—as the comparator. His argument is that *Carlson's* context covers all Eighth Amendment claims alleging deliberate indifference to a substantial risk of serious harm, not just claims alleging inadequate medical care.

Recall that recognizing new causes of actions under *Bivens* is disfavored, and the Supreme Court has instructed that even a "modest extension" of an existing context is all but forbidden. *Abbasi*, 582 U.S. 120 at 135, 147 (quoting *Iqbal*, 556 U.S. at 675); *compare Carlson*, 446 U.S. at 16–18 (implying a *Bivens* remedy for an Eighth Amendment inadequate-medical-care claim), *with Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 71 (2001) (declining to imply a *Bivens* remedy for an Eighth Amendment claim based on the care of a prisoner because the plaintiff sued a private prison facility, not federal officials).

The other thing to remember is that "special factors" play a special role in the analysis. As discussed earlier, both steps

of the *Bivens* inquiry take special factors into account. At the first step, we ask whether the claim arises in a new context—one that is meaningfully different from the cases in the *Bivens* trilogy—while searching for special factors that earlier *Bivens* cases did not consider and giving "special solicitude to … separation-of-powers concerns." *Snowden v. Henning*, 72 F.4th 237, 244 (7th Cir. 2023).

The second step is similar. At this step, we ask "whether 'special factors' indicate that Congress is better equipped in the specific context to assess the costs and benefits of a damages remedy." *Id.* If there is any reason—"even one"—that Congress is arguably better equipped than us to determine whether to create a new remedy, then we may not create one ourselves. *Egbert*, 596 U.S. at 492, 496.

This is why the Supreme Court remarked in *Egbert* that the two-step inquiry sometimes melds into a single step. *Id.* at 492. The reason that a distinction might alter the cost-benefit balance struck in an original *Bivens* case (step one) can also be the reason why Congress might be better positioned to create a remedy in the hope of deterring unconstitutional conduct (step two). *See id.* at 492–93; *Abbasi*, 582 U.S. at 146. Special factors will of course not always dominate the analysis. But when special factors are relevant, they play a part in both steps of the inquiry.

Under these guiding principles, we see no way forward for Sargeant's claim. No matter how we decipher the test—as one step or two—the special factors and separation-of-powers concerns implicated by Sargeant's suit ultimately lead to its dismissal.

At the outset, we point out that Sargeant's claim is far from a repeat of the one in *Carlson*. In *Carlson*, officials allegedly kept a prisoner in a subpar medical facility against the advice of doctors, failed to give him competent care for eight hours after an asthma attack, administered the wrong drugs, used a faulty respirator, and delayed his transfer to a hospital. 446 U.S. at 16 n.1. In this case, Barfield allegedly retaliated against Sargeant by housing him with violent prisoners. Of course, these factual differences alone do not foreclose Sargeant's claim, but the fact that Sargeant's claim arose in a different prison setting is highly relevant. This detail indicates that Sargeant's suit might implicate policy determinations that the Supreme Court did not consider in *Carlson*.

Turning to *Abbasi's* list of potentially meaningful differences confirms this suspicion. 582 U.S. at 139–40. To be sure, Barfield's rank is similar to or lower than the rank of the defendants in *Carlson*, both cases involve the same constitutional right,[3] and there is substantial judicial guidance on both inadequate-medical-care and failure-to-protect claims. Two other considerations—the generality or specificity of the action and the legal mandate under which the official was operating—present closer calls. But we need not discuss them because the last two *Abbasi* considerations cut against Sargeant in a way that dissolves his claim after *Egbert*.

We start with the risk that the claim would interfere with the functioning of another branch. Sargeant insists that no such risk exists because his claim challenges the rogue actions of a rank-and-file official, not the Bureau of Prisons' policies.

---

[3] As we've explained, though, the same amendment does not necessarily mean the same context. *Hernandez*, 140 S. Ct. at 743.

In the abstract, he may have a point. The problem for Sargeant is that, after *Egbert*, the field is tilted toward Barfield. Recognizing failure-to-protect claims against prison officials responsible for cell assignments under *Bivens* will invariably implicate housing policies, which factor in a sensitive mixture of things we are ill-positioned to assess—a prison's determinations about safety, discipline, and resources. Even if we think the risk of intrusion is low here, the Supreme Court has warned that we "likely cannot predict the 'systemwide' consequences of recognizing a cause of action under *Bivens*"—and that the resulting uncertainty alone forecloses relief. *Egbert*, 596 U.S. at 493 (quoting *Abbasi*, 582 U.S. at 136). Mindful of these words, we must conclude—as the Fourth Circuit did in *Bulger*—that recognizing a failure-to-protect claim in this context would bring about at least some risk of intrusion. 62 F.4th at 140–42.

In reaching this conclusion, we recognize that *Carlson* already approved of some intrusion into the functioning of federal prisons. *See Snowden*, 72 F.4th at 246 (concluding that the intrusion in that case was "no more disruptive than what *Bivens* itself already approved"). The important detail here is that Sargeant's claim would interfere with a vastly different part of prison operations—housing assignments instead of medical care—meaning that his claim threatens to intrude in ways *Carlson* did not contemplate.

We turn lastly to other special factors counseling hesitation. The Supreme Court has instructed that if Congress has crafted a relevant alternative remedial structure since the original *Bivens* cases, that is "reason enough" not to imply a new cause of action. *Egbert*, 596 U.S. at 493. It does not matter whether a judicially created damages remedy could work in

conjunction with an existing remedial scheme or whether the existing scheme completely remedies the injury. *Id.* If the legislative or the executive branch has forged a remedy that "it finds" adequate to deter misconduct by individual officials, we cannot "second-guess that calibration by superimposing a *Bivens* remedy." *Id.* at 498. The only thing that matters is whether we are in a better position to decide if existing remedies provide adequate deterrence. *Id.*

Around fifteen years after *Carlson*, Congress passed the Prison Litigation Reform Act of 1995 (PLRA), 42 U.S.C. § 1997e.[4] The Act made "comprehensive changes" to the way prisoners may bring claims in federal court—for example, by requiring them to exhaust any relevant prison grievance procedures before filing suit. *Abbasi*, 582 U.S. at 148; 42 U.S.C § 1997e(a). In federal prisons, a prisoner may seek "formal review" of issues relating to "any aspect of" his "confinement." 28 C.F.R. § 542.10(a). Although the PLRA did not preclude *Bivens* actions, it did not provide for damages remedies in new contexts either. Because of this, *Abbasi* opined that "it could be argued that … Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." 582 U.S. at 149; *Snowden*, 72 F.4th at 244 (recognizing the same). Similarly, in *Malesko*, the Supreme Court declined to recognize a *Bivens* action in part because prisoners "have full access to remedial mechanisms established by the [Bureau of Prisons]," including "grievances filed

---

[4] The dissent would use *Farmer v. Brennan* as its yardstick for the special factors inquiry. 511 U.S. 825 (1994). We note that *Farmer* also predated the PLRA.

through [its] Administrative Remedy Program." 534 U.S. at 74.

Sargeant does not think that the PLRA cuts against him. He contends that because Congress tacked on an exhaustion requirement to prisoner lawsuits but said nothing about *Bivens*, it evidently had no problem with *Bivens* actions. He also maintains that the grievance process was functionally unavailable to him: Barfield retaliated against him because he filed a grievance. In a similar vein, Sargeant says that the grievance process would not redress his harm because he now resides at another prison. The dissent echoes these points.

We might not have disagreed with Sargeant in another era. In fact, before *Egbert*, the Ninth Circuit agreed with similar arguments in a failure-to-protect case. *Hoffman v. Preston*, 26 F.4th 1059, 1069–71 (9th Cir. 2022). After *Egbert*, however, the Ninth Circuit amended its opinion in *Hoffman* to come out the other way, determining that the existence of the Bureau of Prisons' internal grievance process is a rational reason why Congress might not want to authorize a damages remedy in that context. *Hoffman v. Preston*, No. 20-15396, 2022 WL 6685254, at *1 (9th Cir. Oct. 11, 2022) (unpublished). The Fourth Circuit reached the same conclusion. *Bulger*, 62 F.4th at 140–41. Like these courts, we think this outcome is unavoidable after *Egbert*. The arguments made by Sargeant and the dissent run headfirst into the Supreme Court's instructions telling us not to consider whether a *Bivens* action could work alongside an existing scheme or whether the alternative remedy completely compensates the victim. We must instead ask only whether a single reason suggests that Congress is better positioned to assess the need for a remedy or that

Congress might not desire a new remedy. The PLRA and the Bureau of Prisons' grievance program satisfy that low bar.[5]

To put this all together, Sargeant's suit implicates separation-of-powers concerns and other special factors that warrant hesitation. This means that, at step one, his claim arises in a new context. It also means that, at step two, we have reason to think that Congress is arguably better equipped than us to determine whether to imply a novel damages remedy for this sort of claim. Even if we conceptualize the test as a single step, the result would be the same because that step would similarly require us to ask if Congress should make this decision instead of us. *Egbert*, 596 U.S. at 493. So Sargeant's claim does not satisfy the *Bivens* framework no matter how we apply that framework.

At the end of the day, our holding is narrow: the particular claim in front of us cannot go forward because it presents separation-of-powers concerns and special factors not accounted for by any of the Supreme Court's three *Bivens* precedents. We caution against reading more into our opinion. *Egbert* left open the possibility that future claims will satisfy its demanding standard, and we take the Supreme Court at its word. In fact, we recently ruled in *Snowden* that a Fourth Amendment claim alleging excessive force met that standard. 72 F.4th at

---

[5] Barfield also argues that the Federal Tort Claims Act of 1946 (FTCA), 28 U.S.C. § 2674, is a reason to hesitate. We disagree because *Carlson* acknowledged the FTCA and concluded that a *Bivens* remedy was still necessary. 446 U.S. at 19–23. The FTCA, therefore, cannot have "alter[ed] the policy balance that initially justified the cause[] of action recognized in … *Carlson*." *Snowden*, 72 F.4th at 244.

239. Unfortunately for Sargeant, his claim falls outside of the narrow category of suits allowed under today's doctrine.

### III. CONCLUSION

For these reasons, we AFFIRM the judgment of the district court.

HAMILTON, *Circuit Judge*, dissenting. With threats to "weaponize" federal agencies and agents against political opponents a part of the American political debate, the stakes in the Supreme Court's campaign to cut back on *Bivens* actions have never been higher. The ultimate fate of *Bivens* is likely to be resolved in the Supreme Court itself, or perhaps across the street in the United States Capitol. But until that happens, there are still issues and choices for lower courts to address when faced with *Bivens* claims. E.g., *Snowden v. Henning*, 72 F.4th 237 (7th Cir. 2023) (reversing dismissal of claims that paralleled those in *Bivens* itself).

Eighth Amendment claims like that asserted by plaintiff Sargeant—for deliberately putting a prisoner in danger of violence from other prisoners—have long been recognized by the Supreme Court, this circuit, and other courts as entirely suitable for a *Bivens* claim. E.g., *Farmer v. Brennan*, 511 U.S. 825 (1994); *Herron v. Meyer*, 820 F.3d 860 (7th Cir. 2016).

The majority opinion, however, focuses on the Supreme Court's most recent *Bivens* cases. The majority sees some writing on the wall and anticipates that Sargeant's case could no longer survive. That prediction may turn out to be correct, but I do not view that outcome as inevitable just yet. Unless and until the Supreme Court itself announces the complete abandonment of *Bivens* and overrules *Farmer v. Brennan*—and the host of lower-court cases based upon it—I would follow our colleagues in the Third Circuit. We should reverse the district court's dismissal and allow Sargeant to pursue the familiar *Bivens* route for relief under the Eighth Amendment, as recognized in *Carlson v. Green*, 446 U.S. 14 (1980), and *Farmer v. Brennan*. See *Shorter v. United States*, 12 F.4th 366 (3d Cir. 2021) (reversing dismissal of failure-to-protect claim under *Bivens*);

*Bistrian v. Levi*, 912 F.3d 79, 90–91 (3d Cir. 2018) (affirming denial of summary judgment on failure-to-protect claim under *Bivens*); contra, *Bulger v. Hurwitz*, 62 F.4th 127, 139 (4th Cir. 2023) (affirming dismissal of failure-to-protect claim as presenting *Bivens* claim in new context). As the Supreme Court and we have often said, the Supreme Court "does not overrule itself silently." *Censke v. United States*, 947 F.3d 488, 492 (7th Cir. 2020), citing *Rodriguez de Quijas v. Shearson*, 490 U.S. 477, 484 (1990).

The story here does not begin with *Bivens* itself. From the earliest days of the Republic, federal courts awarded damages against federal officers for violating the legal rights of United States citizens and others. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 395–96 (1971). Consistent with those longstanding practices and centuries of judicial experience crafting and fine-tuning remedies for wrongs, *Bivens* recognized a right of action for damages directly under the Constitution for violations of individual rights.

In *Bivens*, the rights violated were Fourth Amendment rights against unreasonable searches and the use of unreasonable force. Yet nothing about the reasoning of *Bivens* was limited to the Fourth Amendment. Lower federal courts began applying *Bivens* to other individual rights. A few years after *Bivens*, the Supreme Court applied it to the implied equal protection branch of the Fifth Amendment's Due Process Clause and to the Eighth Amendment prohibition on cruel and

unusual punishment of prisoners. *Davis v. Passman*, 442 U.S. 228 (1979); *Carlson*, 446 U.S. 14.[1]

In this case, Sargeant alleges that defendant Barfield deliberately put him at risk by assigning him to share cells with other prisoners known to be especially aggressive and violent. *Farmer v. Brennan* presented a nearly identical claim: that federal prison officials had deliberately assigned a transgender prisoner housing where she was likely to be assaulted, and she was in fact assaulted. 511 U.S. at 830–31.

Such failure-to-protect claims have been recognized by this court and others for decades. E.g., *Herron*, 820 F.3d at 862–63 (reversing summary judgment for defendant); *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) (recognizing failure-to-protect theory but affirming summary judgment for failure to offer evidence of defendant's actual knowledge of threat); *Bagola v. Kindt*, 131 F.3d 632, 646 (7th Cir. 1997) (also recognizing theory but affirming summary judgment where defendants took reasonable actions in response to danger); see also *Doe v. Robertson*, 751 F.3d 383, 393–94 (5th Cir. 2014) (recognizing theory but reversing denial of dismissal based on qualified immunity); *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980) (reversing dismissal); *Smith v. United States*, 561 F.3d 1090, 1104–06 (10th Cir. 2009) (reversing dismissal); *Caldwell v. Warden*, 748 F.3d 1090, 1099–1102 (11th Cir. 2014) (reversing summary judgment for defendants); *Risley v. Hawk*, 108 F.3d

---

[1] In the wake of *Davis* and *Carlson*, debates in courts over the scope of *Bivens* focused on whether Congress had enacted other remedies that should suffice as substitutes for the *Bivens* damages remedy. The most prominent examples were constitutional claims arising out of the Social Security system and federal employment. See *Schweiker v. Chilicky*, 487 U.S. 412 (1988); *Bush v. Lucas*, 462 U.S. 367 (1983).

1396 (D.C. Cir. 1997) (recognizing theory but affirming summary judgment where defendant took action); *Rodriguez v. Thomas*, 299 F. Supp. 3d 618, 635, 645 (M.D. Pa. 2018) (denying summary judgment on failure-to-protect *Bivens* claim); *Browning v. Pennerton*, 633 F. Supp. 2d 415, 433 (E.D. Ky. 2009) (same).

In a series of recent cases, however, the Supreme Court has resurrected the policy arguments made by the *Bivens* dissenters. Compare *Bivens*, 403 U.S. at 411–12 (Burger, C.J., dissenting), *id*. at 427–30 (Black, J., dissenting); and *id*. at 430 (Blackmun, J., dissenting), with *Ziglar v. Abbasi*, 582 U.S. 120 (2017), *Hernandez v. Mesa*, 589 U.S. —, 140 S. Ct. 735 (2020), and *Egbert v. Boule*, 596 U.S. 482 (2022), where the Court's opinions argue against the power and competence of the Court to provide a damages remedy for constitutional violations in the absence of express statutory authority. The Supreme Court is now instructing lower courts not to recognize a *Bivens* claim without applying the two-step test described by the majority to consider the "context" of the plaintiff's case vis-à-vis the Supreme Court's own precedents.

As applied by the majority here and by some other circuits, that test has the practical effect of limiting *Bivens*, *Carlson*, and *Davis* strictly to their facts, thereby implicitly overruling *Farmer v. Brennan*. That may be the intent of the Supreme Court's most recent cases. Absent an express declaration from the Supreme Court to that effect, though, it's not our job to anticipate that result. I base this conclusion on the long history of *Bivens*, its antecedents, and its progeny, including *Farmer*, as well as fifty years of congressional acceptance of *Bivens*, and the principle that we should follow Supreme Court precedents the Court itself has not overruled.

*Farmer v. Brennan* is squarely on point here. A federal prisoner brought a *Bivens* claim under the Eighth Amendment. She offered evidence that she had been assigned to a prison in the general population where she was at high risk of assault by other prisoners, and she was in fact assaulted. This court had affirmed summary judgment for defendants. The Supreme Court granted certiorari to address a circuit split on the meaning of "deliberate indifference" in Eighth Amendment cases. 511 U.S. at 832. The Court adopted in essence the subjective recklessness standard from criminal law, *id*. at 839–40, and remanded for further proceedings on Farmer's *Bivens* claim.

The majority's analysis here is built on the premise that *Farmer* is not a true *Bivens* case because the Supreme Court did not list *Farmer* recently as one of its approved "contexts" for *Bivens*. It is evident, however, that at least eight Justices in *Farmer* had no doubt that, with sufficient proof of deliberate indifference, *Bivens* applies to a failure to protect a prisoner.[2]

If *Bivens* and *Carlson v. Green* did not extend to deliberate failures to protect prisoners, *Farmer* would have been an odd vehicle for the Supreme Court to address the Eighth Amendment standard. The majority's theory turns *Farmer*, with hindsight, into a misguided waste of everyone's time. The better view is that the universal assumption in *Farmer* that a *Bivens* remedy was available shows that the Court was treating failure-to-protect claims as fitting comfortably within the

---

[2] Justice Thomas concurred in the judgment and explained his disagreement with the failure-to-protect theory under the Eighth Amendment without distinguishing between federal or state prisoners. 511 U.S. at 858–62 (Thomas, J., concurring in the judgment). His opinion also did not question the availability of a *Bivens* remedy for federal prisoners.

reasoning of *Carlson*. That conclusion was so obvious in *Farmer* that it did not need to be questioned or explained. *Farmer* has not been overruled by the Supreme Court, and we have no authority to do so.

Sargeant's claims thus do not present a "new context," at least while *Carlson* and *Farmer* remain on the books. Yet even applying the two-step test from *Abbasi* and *Egbert*, Sargeant has stated a valid *Bivens* claim under the Eighth Amendment for deliberate failure to protect him from imminent harm.

A *Bivens* claim may proceed if it arises in an existing *Bivens* context that is not "different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Bistrian*, 912 F.3d 79, 89–90, quoting *Abbasi*, 582 U.S. at 139. The Court has written that meaningful differences to render a context "new" include: (1) the rank of the officers involved; (2) the constitutional right at issue; (3) the generality or specificity of the official action; (4) the extent of judicial guidance for the officer's conduct; (5) the statutory or other legal mandate under which the officer was operating; and (6) the risk of disruptive intrusion by the Judiciary into the functioning of the political branches. See *Bistrian*, 912 F.3d at 90, quoting *Abbasi*, 582 U.S. at 140. These possibilities show that Sargeant's claim fits comfortably within *Carlson* and *Farmer*.

*(1) Officers' Rank.* Sargeant has sued a front-line prison official. The plaintiffs in both *Carlson* and *Farmer* sought relief from front-line officials and higher-ranking officials, including the federal Bureau of Prisons director and the prison warden respectively. See *Carlson*, 446 U.S. at 14; *Farmer*, 511 U.S. at 825. That factor weighs in Sargeant's favor.

*(2) The Constitutional Right.* Sargeant has asserted deliberate indifference to a known risk of serious harm claim under the Eighth Amendment—the same constitutional right allegedly violated in both *Carlson* and *Farmer.*

*(3) Generality or Specificity of the Official Action.* Sargeant is not challenging a broad prison policy. He challenges specific acts and decisions of an official aimed specifically at him. *Carlson* similarly challenged the specific acts of individual officials who were indifferent to a prisoner's serious medical condition. The specific acts in *Farmer* were even closer to this case, dealing with an individual prisoner's cell assignment.

*(4) Extent of Judicial Guidance for Officer's Conduct. Farmer* is the Supreme Court's guide on failure-to-protect claims under the Eighth Amendment. Such claims by federal, state, and local prisoners are unfortunately routine in the federal courts. Judicial guidance is extensive.

*(5) Statutory or Other Legal Mandate.* The actions at issue here involve prison policies on prisoner placement and a legal mandate to try to protect prisoners from violent attacks by other prisoners. These are not meaningfully different from the policies or legal mandate in *Farmer.* This context is similar enough to the context of *Carlson* that the Court in *Farmer* did not even need to bother addressing the application of *Carlson.*

*(6) Risk of Disruptive Intrusion by the Judiciary into Functioning of Other Branches.* Sargeant's claim threatens no further "intrusion" than the Supreme Court has long accepted in cases brought by federal, state, and local prisoners. Again, such cases are routine. Trying a front-line prison official's alleged actions in putting a particular prisoner deliberately at

risk poses little if any risk of disruption of executive or legis-
lative power.

So this case does not present a new context. See *Shorter v.
United States*, 12 F.4th 366 (3d Cir. 2021); *Bistrian*, 912 F.3d at
90–91. For essentially the same reasons, no special factors
counsel against providing *Bivens* relief.

First, as noted, this case involves not a high-level federal
policy but specific actions of a front-line official aimed at one
prisoner. Sargeant does not seek to reform over-arching
prison management or prison policies. His claims certainly do
not invoke issues of national security or international comity
that were present in *Abbasi*, *Hernandez*, and *Egbert* and help
explain their departures from precedent. Sargeant alleges that
a corrections officer deliberately created the risk of harm and
then failed to protect him from that harm. Deciding this case
would not cause courts to intrude into broad or sensitive
prison policies.

Second, the internal grievance process is clearly inade-
quate in this instance. In fact, according to Sargeant's com-
plaint, his earlier use of that process triggered Barfield's retal-
iation that put him at risk.

The Supreme Court has also said that courts should hesi-
tate to extend the *Bivens* remedy into a new context when
"legislative action suggest[s] that Congress does not want a
damages remedy." *Abbasi*, 582 U.S. at 1498. I agree with the
Third Circuit "that congressional silence in the PLRA about
the availability of *Bivens* remedies" does not suggest that Con-
gress intended to make such remedies unavailable, *Bistrian*,
912 F.3d at 92–93, and the same is true for other statutes.

Thus, even the new two-step framework for *Bivens* claims, Sargeant's claim does not present a new context but a routine, all-too-familiar Eighth Amendment claim already recognized by the Supreme Court in *Carlson* and *Farmer*, and by many lower-court cases. We should reverse.

Beyond the specifics of Sargeant's case, the practical stakes of the Supreme Court's dismantling of *Bivens* are high. *Bivens* offers an effective remedy where federal agents violate clearly established constitutional law. It's not a perfect remedy, nor is it the only deterrent against abuse of power and authority by federal agents. *Bivens* claims can fail for many reasons, including the defense of qualified immunity. Also, apart from *Bivens* claims, discipline by supervisors and, in egregious cases, even criminal prosecution can help deter abuses. But unlike those other deterrents, a *Bivens* claim is outside the control of the executive branch, which is comprised of the very officials that *Bivens* is designed to check.

Americans are justly proud of our constitutional protections of individual rights. But the *declaration* of those rights in the Bill of Rights and the Thirteenth, Fourteenth, and Fifteenth Amendments is not sufficient grounds for satisfaction or self-congratulation. Many national constitutions announce similar protections of individual rights.[3]

---

[3] For example, Article 29 § 1 of the Constitution of the Russian Federation provides: "Everyone shall be guaranteed freedom of thought and speech." Article 35 of the Constitution of the People's Republic of China provides: "Citizens of the People's Republic of China shall enjoy freedom of speech, the press, assembly, association, procession, and demonstration." Article 67 of the Socialist Constitution of the Democratic People's Republic of Korea provides: "Citizens are guaranteed freedom of speech, of the press, of assembly, demonstration and association." The Russian

Those precious rights under the United States Constitution are meaningful because of our mechanisms to enforce them. "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Bivens*, 403 U.S. at 397, quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803); accord, 3 William Blackstone, Commentaries on the Laws of England *23 ("where there is a legal right[,] there is also a legal remedy").

An independent judiciary's power to issue injunctions against federal (or state and local) agencies and officers to ensure compliance is a critical tool in making those declared constitutional rights real. In many cases, however, an injunction would come too late to do any good for a victim of government abuse. Doctrines of ripeness and standing also can prevent prospective injunctions without a clear threat that the plaintiff herself will again be a victim of the same conduct. E.g., *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) (plaintiff lacked standing to seek injunctive relief under 42 U.S.C. § 1983 absent real and imminent threat of repeated use of challenged chokehold against plaintiff specifically). Defendants in criminal cases may invoke the exclusionary rule to prevent the use of unconstitutional techniques to obtain their conviction. But for victims of government abuses who do not face prosecution or imminent repetition of the abuse, it is, as

and Chinese constitutions even expressly authorize damages remedies for violations of constitutional rights by government officials. Konstitutsiia Rossiĭskoĭ Federatsii [Konst. RF] [Constitution] arts. 29 § 1 & 53 (Russ.); Xianfa arts. 35 & 41 (2018) (China); Joseon Minjujuui Inmin Gonghwaguk Sahoejuui Heonbeop [Constitution] art. 6 (N. Kor.).

Justice Harlan wrote in *Bivens*, "damages or nothing." 403 U.S. at 410 (Harlan, J., concurring in judgment).

In *Egbert*, *Hernandez*, and *Abbasi*, the Supreme Court opted for nothing. As those cases are applied by the majority here and by some other circuits, a federal agent who violates the Constitution to carry out the policies of the federal executive branch now has little to fear in terms of direct accountability.

Dissenting opinions in *Egbert*, *Hernandez*, and *Abbasi* have criticized the dismantling of this vital legal restraint on the federal government and its agents. There is no need, and it is not my place, to repeat those criticisms. See *Abbasi*, 582 U.S. at 160–82 (Breyer, J., dissenting); *Hernandez*, 140 S. Ct. at 753–60 (Ginsburg, J., dissenting); *Egbert*, 596 U.S. 482 at 504–27 (Sotomayor, J., dissenting in relevant part). It may, however, be useful to make three observations: first, the deeper roots of *Bivens* (far deeper than *Bivens* itself took the time to expound); second, the history of its acceptance by Congress; and third, the potential for a statutory solution for those concerned about losing this important restraint on abuses of federal power.

*The Roots of Bivens.* The Supreme Court's recent criticisms of *Bivens* treat it as if it were a judicial creation from whole cloth in 1971. Framed that way, as a modern innovation by judges, it seems to lack legitimacy. That's how the Court's recent opinions dismantling *Bivens* have framed the issue. *Bivens* itself, however, pointed to the long history of United States courts providing damages remedies against federal officers who violated the legal rights of civilians, including Fourth Amendment rights. 403 U.S. at 395–97, citing multiple sources, including *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("where federally protected rights have been invaded, it has

been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief"), and *West v. Cabell*, 153 U.S. 78 (1894) (allowing suit for damages for false arrest on U.S. marshal's bond to ensure faithful performance of duties). See also *Abbasi*, 582 U.S. at 163–65 (Breyer, J., dissenting) (noting historical foundations of *Bivens*).

Scholars have pointed out that the roots are far deeper than *Bivens* itself explained. Particularly helpful is a book by Professor James E. Pfander, Constitutional Torts and the War on Terror (Oxford 2017). Chapter 1, entitled "Government Accountability in the Nineteenth Century," reviews English law on the subject and focuses on several cases from the early years of our Republic in which federal courts awarded damages against federal officers for wrongs committed in the course of their official duties. In the usual pattern for such cases, Congress would then enact special legislation to indemnify the officer for the damage award. See, e.g., *Little v. Bareme*, 6 U.S. (2 Cranch) 170 (1804) (affirming damage award against Navy captain for wrongful seizure of a ship on high seas); Act for the Relief of George Little, ch. 4, 6 Stat. 63 (1807); Act of March 2, 179, ch. 28, 1 Stat. 723, 724 (appropriating money to cover damages against United States for wrongful seizure of different ship).[4]

---

[4] For additional examples, see the notes in Pfander, Constitutional Torts and the War on Terror at 182–87, and James E. Pfander and Jonathan L. Hunt, *Public Wrongs and Private Bills: Indemnification and Government Accountability in the Early Republic*, 85 N.Y.U. L. Rev. 1862, 1932–39 (2010) (collecting petitions for indemnification for claims against federal military officers, revenue and customs officials, marshals, and postal officials from 1799 to 1865).

Officers indemnified through this mechanism included then General and future President Andrew Jackson, who was fined $1,000 by a federal judge for having maintained martial law in New Orleans after word arrived of a peace agreement ending the War of 1812. See Abraham Sofaer, *Emergency Power and the Hero of New Orleans*, 2 Cardozo L. Rev. 233 (1981); David J. Barron & Martin S. Lederman, *The Commander in Chief at the Lowest Ebb—Framing the Problem, Doctrine, and Original Understanding*, 121 Harv. L. Rev. 689, 747 n. 181 (2008). (Jackson paid the fine and did not seek indemnification, but was awarded indemnification by Congress decades later.)

Professor Pfander points out that no less an authority on the United States Constitution than James Madison had endorsed judicial damages awards for wrongs committed by federal officers. Pfander, Constitutional Torts and the War on Terror at 9, 16. He summarized:

> On Madison's approach, * * * the federal courts (and on occasion the state courts) were to pass on the legality of the officer's conduct in suits for damages. * * * Nineteenth century jurists also assumed that civilian courts were the proper forum for claims brought against military, revenue, and postal officers who exceeded the bounds of their authority and inflicted injuries on innocent third parties. Such victims of federal official misconduct were entitled to sue in federal court; their status as foreign nationals was no bar to recovery. The military or, if you will, national security context of the litigation did not trigger any hesitation on the part of the courts; they proceeded to the merits and

> adjudicated the claim. * * * [I]t was up to Con-
> gress to indemnify officers who acted in good
> faith, thereby ensuring the provision of com-
> pensation and redress to the victims of govern-
> ment wrongdoing and immunity for well-
> meaning government officials.

*Id*. at 16.

*Congressional Acceptance of Bivens*. In the wake of *Bivens*, Congress has not tried to resist it as an illegitimate judicial innovation. Instead, Congress has legislated to integrate *Bivens* actions into a broader web of remedies available for government wrongdoing. As for the basic premise of providing a damages remedy implied under the Constitution, Justice Breyer wrote in dissent in *Abbasi*: "our cases have recognized that Congress' silence on the subject [of *Bivens*] indicates a willingness to leave this matter to the courts." 582 U.S. at 165 (Breyer, J., dissenting).

Examples of legislation to accommodate *Bivens* include amendments to the Federal Tort Claims Act, see 28 U.S.C. §§ 2679(b) & 2680(h), making clear that tort claims and *Bivens* were not mutually exclusive but could co-exist. See *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 68 (2001) ( "'crystal clear' that Congress intended the FTCA and *Bivens* to serve as 'parallel' and 'complementary' sources of liability"), quoting *Carlson*, 446 U.S. at 19–20.

The Torture Victims Protection Act of 1991, codified as a note to 28 U.S.C. § 1350, provides civil remedies in United States courts against officials of *foreign* governments who engage in torture or extrajudicial killing—so long as adequate remedies are not available where the torture or killing

occurred. This statutory remedy limited to foreign officials would be hard to understand if Congress had not assumed and accepted that *Bivens* would already supply a remedy against United States officials for similar wrongs.

The Prison Litigation Reform Act of 1995 imposed some important restrictions on the ability of prisoners to obtain relief for constitutional violations, but those provisions assume that *Bivens* is available as a substantive remedy. See 42 U.S.C. § 1997e(a) & (e). The Detainee Treatment Act of 2005 granted United States officers a limited good-faith immunity for civil suits by alien detainees. The Act clearly assumed *Bivens* would provide a civil right of action for both aliens and United States citizens. These legislative actions over decades signal that Congress has generally been satisfied to leave development of *Bivens* doctrine to the Supreme Court, without trying to force the Court to dismantle it.

*Statutory Solutions*. The Supreme Court's recent decisions may well aim toward dismantling the *Bivens* remedy entirely. Its reasoning makes clear, however, that Congress may act to provide a damages remedy for people who are injured by federal officers that commit constitutional violations. Citizens and members of Congress who are troubled by this dismantling can fix it by enacting a federal statute, perhaps one parallel to 42 U.S.C. § 1983, or perhaps one with further policy refinements written into the statute.

To sum up, we do not need to get out in front of the Supreme Court itself in dismantling *Bivens*. We should follow the Third Circuit in *Bistrian* and *Shorter* and reverse the dismissal of Sargeant's Eighth Amendment claim. I respectfully dissent.